# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TIMOTHY MILLER, | No. 4:17-CV-01590 |
| Plaintiff. | (Judge Brann) |
| v. | |
| STEVEN HELM, et al., | |
| Defendant. | |

## MEMORANDUM OPINION

### DECEMBER 15, 2017

Defendants Steve Helm, Williams Hall, Elizabeth Miele, the City of Williamsport, and the Fraternal Order of Police, Lodge 29, all moved to dismiss Plaintiff Timothy Miller's Complaint. For the reasons that follow, Defendants' motions are denied.

## I. BACKGROUND[1]

### A. Cast of Characters

Before delving into the events leading to this lawsuit, it is worth providing a succinct "cast of characters." These players can be divided into two camps,

---

[1] When considering a motion to dismiss for failure to state a claim, a court assumes the truth of all factual allegations made in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The material in this section, then, is taken entirely from Mr. Miller's Complaint, ECF No. 1 Ex. B, and is presumed true for present purposes.

depending on whether they are aligned with, or oppose,[2] Gabriel Campana, the Mayor of the City of Williamsport, Lycoming County, Pennsylvania.[3]

Aligned with Mayor Campana is former Williamsport Chief of Police Greg Foresman[4] and Plaintiff Timothy Miller, who served as the City's Assistant Chief of Police.[5] Mayor Campana's opponents are Defendant William Hall, former President of Williamsport's City Council;[6] Defendant Elizabeth Miele, a member of that Council;[7] Defendant Steven Helm, a City police officer and President of the Fraternal Order of Police ("FOP") Lodge 29;[8] and Shelley Read-Helm, Mr. Helm's wife.[9]

The FOP Lodge 29 is the labor organization that represents Williamsport police officers.[10] Mr. Miller is a member of that lodge.[11]

---

[2] *See* ECF No. 1, Ex. B ¶ 9 ("The individual defendants have all openly expressed their antagonism towards the Police administration and the Mayor of the City of Williamsport . . . .").

[3] *Id.* ¶ 18.

[4] *Id.* ¶ 42.

[5] *Id.* ¶ 8.

[6] *Id.* ¶ 4.

[7] *Id.* ¶ 5.

[8] *Id.* ¶ 2.

[9] *Id.* ¶ 3. Ms. Read-Helm was originally named as a defendant, but was dismissed by stipulation. ECF No. 2.

[10] *Id.* ¶ 7. It is the "sole bargaining unit between the Williamsport Bureau of Police, its officers, and the City of Williamsport." *Id.* ¶ 14.

[11] *Id.* ¶ 15.

### B. Mr. Hall's Offer—and Threat—to Mr. Miller

In June 2014, Mr. Hall asked Mr. Miller to meet him at a Dunkin Donuts restaurant in Hughesville.[12] At that meeting, Mr. Hall indicated his intention to run for Williamsport Mayor (against Mayor Campana), and that Mr. Miller was on Mr. Hall's "short list" of candidates for Chief of Police if he were to win the election.[13] Mr. Miller alleges that Mr. Hall sought Mr. Miller's political support via "threat," saying that "dirty politicians"—presumably, Mr. Hall—"get rid of people who know too much."[14] Mr. Miller also alleges that Mr. Hall claimed to have the local newspaper, the Williamsport Sun Gazette, "in his back pocket," and could, therefore, control its "political attacks."[15] Mr. Miller reported the alleged threat to the local Federal Bureau of Investigation office in Williamsport.[16]

At some point, Mr. Hall repeated his "short list" offer to Mr. Miller via text message.[17] Mr. Miller replied that he would "make it easy for" Mr. Hall—*i.e.*, that he did not want or need the Chief of Police position.[18] Mr. Hall made his candidacy public in February 2015, with Ms. Miele attending his "announcement

---

[12] *Id.* ¶ 17.
[13] *Id.*
[14] *Id.*
[15] *Id.* ¶ 18-19.
[16] *Id.* ¶ 19.
[17] *Id.* ¶ 22.
[18] *Id.*

ceremony."[19] Mr. Hall eventually lost to Mayor Campana in the primary three months later.[20]

### B. Rape Accusation against Mr. Hall

In addition to his duties as Assistant Chief of Police, Mr. Miller also served as the Commander of the Williamsport Police Department's Criminal Investigation Division.[21] It was in that role that—at a time unspecified in the Complaint—he allegedly received a report from a Williamsport woman who claimed to have been raped by Mr. Hall.[22] The woman also allegedly reported harassing text messages and explicit photographs received from Mr. Hall.[23] Mr. Miller sent investigators to the woman's residence to collect her cell phone, which was turned over to the Pennsylvania State Police.[24]

### C. The Helms' Son's Application for a Job with the Williamsport Police Department

In late 2014, the Helms' son Sheldon applied for a job at the Williamsport Police Department.[25] He failed the polygraph examination administered as part of that application process.[26] Because his father was a police officer, he was offered a

---

[19] *Id.* ¶ 25.
[20] *Id.* ¶ 31.
[21] *Id.* ¶ 20.
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] *Id.* ¶ 23.
[26] *Id.*

second test, but "stormed out of" it after some questioning.[27] As a result, Mr. Helm allegedly told others that Mr. Miller "'f*****' his son out of getting hired," and that he "vow[ed] to do whatever he had to do to make this right."[28] Later, Mr. Miller was required to testify about "alleged improprieties in [Sheldon's] hiring process" at an executive session of the Williamsport City Council.[29] The Council eventually "agree[d that] there was no foul play involved in the adverse hiring decision."[30]

### D. Mr. Miller's Email Addressing Police Department Leaks

In February 2015, then-Chief Foresman ordered Mr. Miller to compose an email to members of the Williamsport Police Department addressing the repeated leaking of confidential information to the media.[31] This email was sent to the Police Department's "distribution list" and to all members of the City Council.[32] Ms. Read-Helm posted a copy of this email on Facebook, although it is unclear from the Complaint whether she received a copy personally or posted the copy received by her husband, since the Complaint alleges that she had "unfettered access" to her husband's FOP Lodge 29 email account.[33]

---

[27] *Id.*

[28] *Id.* (alteration in original).

[29] *Id.* ¶ 24.

[30] *Id.*

[31] *Id.* ¶ 27.

[32] *Id.*

[33] *Id.* ¶¶ 13, 27.

At a time unspecified in the Complaint, Mr. Miller alleges that Mark Maroney, a reporter for the Sun Gazette, identified Mr. Helm and Ms. Read-Helm as the source of (at least some of) the leaks.[34] Mr. Maroney claimed that Mr. Helm and Ms. Read-Helm—who were "privy to each piece of confidential information that was leaked"—would provide information to Mr. Hall who, in turn, would contact the Sun Gazette.[35]

In May 2015, Mr. Helm filed an unfair labor practice complaint against the city in response to this email and to postings made by Mr. Miller on his personal Facebook page.[36]

### E. Threatened Elimination of the Assistant Chief of Police Position

In December 2015, Mr. Hall wrote a post on social media indicating his intention to eliminate the position of Assistant Chief of Police.[37] Mr. Maroney contacted Mr. Miller about Mr. Hall's "call[] for [Mr. Miller] to be sent back to the ranks."[38] Mr. Miller was also contacted by another "media source" who invited Mr.

---

[34] *Id.* ¶ 27.

[35] *Id.* ¶ 27.

[36] *Id.* ¶ 32. The basis of Mr. Helm's claim—*i.e.*, why he felt this email constituted an unfair labor practice—is not clear from the Complaint. Additionally, the Complaint does not identify the subject matter or content of Mr. Miller's Facebook postings.

[37] *Id.* ¶ 33.

[38] *Id.*

Miller to participate in an on-camera debate about "an unethical rant" made by Mr. Hall about Mr. Miller.[39]

Mr. Miller believed that these actions were in response to Mr. Miller's refusal to support Mr. Hall in his mayoral bid.[40]

### F.  Public Confrontation Between Mr. Hall and Mr. Miller

At a public meeting in December 2015, in front of Mayor Campana and then-Chief Foresman, Mr. Hall accused Mr. Miller of "badmouthing" a "highly publicized issue."[41] Believing that this accusation was also in response to Mr. Miller's failure to support Mr. Hall's mayoral bid, Mr. Miller responded by calling Mr. Hall a "liar" and by noting that he had "went to the authorities"—*i.e.*, that Mr. Miller contacted the FBI after Mr. Hall's initial "threat" at the Dunkin Donuts.[42] In response, Mr. Hall stated that he believed that Mr. Miller should be subject to disciplinary action.[43]

### G.  Discipline of Mr. Miller

In March 2016, Mr. Miller emailed several documents to the City's labor counsel "regarding perceived discipline for two posts [Mr. Miller] made on his

---

[39] *Id.*

[40] *Id.*

[41] *Id.* ¶ 34.

[42] *Id.*

[43] *Id.*

personal Facebook page."[44] These documents had been requested by FOP Lodge 29's labor counsel.[45] Presumably, these posts were the ones identified in Mr. Helm's May 2015 unfair labor practice complaint, and the "perceived discipline" was a result of an investigation into Mr. Helm's complaint, since the Complaint indicates that a "consent order [was] entered in regards to the unfair labor practice[,] . . . [which order] specified that [Mr. Miller] would receive a written reprimand for [his] inappropriate Facebook postings."[46]

Included in this email was a document containing "information regarding [Mr.] Miller being threatened by several high level political figures."[47] The document also contained a description of Mr. Miller's "medical difficulties," which included heart problems and "mental[]" issues resulting from the "openly hostile environment" caused by Mr. Miller's "association with Mayor Campana and Chief Foresman."[48] The document was later posted in its entirety on a Facebook page titled "Is Gabe Campana an awful Mayor."[49]

In April 2016, Ms. Read-Helm gave "kudos" to Mayor Campana and the City Council on social media, noting that they "took [her] complaints with [Mr.]

---

[44] *Id.* ¶ 35.

[45] *Id.*

[46] *Id.* ¶ 36.

[47] *Id.* ¶ 35.

[48] *Id.* ¶ 35.

[49] *Id.* ¶ 35. See *infra* § I.H.

Miller seriously."[50] Mr. Miller alleges that "[t]his post makes it obvious that [Ms. Read-]Helm . . . provided City Council with information . . . which they used to put political pressure upon [Mr.] Miller using the Williamsport Sun Gazette and [Council] executive sessions requiring [Mr. Miller's] testimony."[51]

### H. "Is Gabe Campana an Awful Mayor"

At some point, a Facebook page entitled "Is Gabe Campana an Awful Mayor" was launched, which became "a one stop shop for gossip, rumors, innuendos," and an "open forum to assassinate the character of anyone associated with" Mayor Campana or Chief Foresman.[52] In August 2016, Ms. Read-Helm posted to this group, saying that "What we all need to do is comprise a portfolio of verifiable documents, emails, texts, hard copy documents[,] etc[.]"[53] On September 10, 2016, a friend notified Mr. Miller that a document containing Mr. Miller's "personal information" was posted to this group by someone with the screenname "Elle Mae."[54] This document was taken from Mr. Miller's personnel file and "contained information regarding [Mr.] Miller seeking psychological counseling after being threatened by [Mr. Hall] and under constant pressure from the Williamsport Sun Gazette as a result of his association with [Mayor] Campana

---

[50] *Id.* ¶ 37.

[51] *Id.* ¶ 37.

[52] *Id.* ¶ 40.

[53] *Id.* ¶ 41.

[54] *Id.* ¶ 42. It is unclear whether this document was the same document mentioned *supra*, § I.G.

and [Chief] Foremsman."[55] It would later be revealed that Ms. Read-Helm had access to the "Elle Mae" screenname account.[56]

### I. Mr. Miller's Job with the Sunbury Police Department

In July 2016, while still employed by the Williamsport Police Department, Mr. Miller began working part-time with the Sunbury Police Department.[57] The Sun Gazette ran a headline about Mr. Miller's new job, and published several quotes from City Council members "voic[ing] their displeasure" about it.[58]

The Sunbury Daily Item began to receive calls from Williamsport City Council members, and a "source" at the Daily Item told Mr. Miller that "he obviously had made some political enemies in Williamsport and they were brutal."[59] According to the source, Councilwoman Miele indicated that Mr. Miller "was mentally unstable and not fit to be a Police Chief."[60]

### J. Mr. Miller Resigns

Eventually, "[t]he pattern of harassment, mental abuse, and retaliation meted out to [Mr.] Miller by" Mr. Hall, Ms. Miele, Mr. Helm, and Ms. Read-Helm made

---

[55] *Id.* ¶ 42.

[56] *Id.* ¶ 51.

[57] *Id.* ¶ 52.

[58] *Id.* ¶ 53.

[59] *Id.* ¶ 54.

[60] *Id.* ¶ 54.

Mr. Miller's "continued employment with the City of Williamsport so harmful to his mental and physical health that he was compelled to resign."[61]

### K. Mr. Miller Reports "Corruption," "Mismanagement," "Wrongdoing," or "Waste"

Without any further elaboration, Mr. Miller's Complaint alleges (1) that he "reported suspected corruption within city government[,] especially regarding [Mr.] Hall," and "reported threats to the FBI, [the] Williamsport Bureau of Police, . . . the Lycoming [C]ounty District Attorney, Mayor Campana, and members of City Council";[62] (2) that he "raised concerns of corruption and mismanagement within the City of Williamsport and also made personal Facebook postings which were construed incorrectly as comments on [Mr.] Helm";[63] and (3) that he "witnesse[d]/had evidence of wrongdoing or waste of the City of Williamsport" and "brought this information to the attention of his chain of command."[64]

### L. Procedural History

On August 7, 2017, Mr. Miller filed a complaint against Defendants in the Court of Common Pleas of Lycoming County.[65] On September 7, 2017, the suit was removed to this Court.[66]

---

[61] *Id.* ¶ 55.

[62] *Id.* ¶ 59.

[63] *Id.* ¶ 53.

[64] *Id.* ¶ 72-73.

[65] ECF No. 1, Ex. B.

[66] ECF No. 1 (Notice of Removal).

Mr. Miller's Complaint alleges seven counts. Count I is a First Amendment retaliation claim brought against Mr. Helm, Mr. Hall, and Ms. Miele.[67] Count II is a Due Process Clause claim brought against Mr. Helm, Mr. Hall, Ms. Miele, and the City of Williamsport.[68] Count III is a § 1985 conspiracy claim brought against Mr. Helm, Mr. Hall, Ms. Miele, and the City of Williamsport.[69] Count IV is a Pennsylvania Whistleblower Law claim brought against Mr. Helm, Mr. Hall, Ms. Miele, and the City of Williamsport.[70] Count V is a duty of fair representation claim brought against Mr. Helm and the FOP Lodge 29.[71] Count VI is a Defamation claim brought against Mr. Helm.[72] And Count VII is a defamation claim brought against Ms. Miele.[73]

On September 14, 2017, Mr. Helm, Mr. Hall, Ms. Miele, and the City of Williamsport moved to dismiss Mr. Miller's Complaint under Federal Rule of Civil Procedure 12(b)(6).[74] The FOP Lodge 29 filed its own motion to dismiss on September 20, 2017.[75]

---

[67] ECF No. 1, Ex. B ¶¶ 61-64.

[68] *Id.* ¶¶ 65-67.

[69] *Id.* ¶¶ 65-69. (The Complaint contains two paragraphs numbered 65, 66, and 67.)

[70] *Id.* ¶¶ 70-74.

[71] *Id.* ¶¶ 75-78.

[72] *Id.* ¶¶ 79-83. This claim was originally brought against Ms. Read-Helm as well, but she was dismissed. *See supra* FN 8.

[73] *Id.* ¶¶ 84-88.

[74] ECF No. 4.

[75] ECF No. 5.

Mr. Miller filed oppositions to these motions on October 17, 2017.[76] While doing so, however, he withdrew his Due Process Clause claim (Count II) and his § 1985 conspiracy claim (Count III).[77]

## II. DISCUSSION

### A. Standard of Review

When considering a motion to dismiss for failure to state a claim upon which relief may be granted,[78] a court assumes the truth of all factual allegations in a plaintiff's complaint and draws all inferences in favor of that party;[79] the court does not, however, assume the truth of any of the complaint's legal conclusions.[80] If a complaint's factual allegations, so treated, state a claim that is plausible – *i.e.*, if they allow the court to infer the defendant's liability – the motion is denied; if they fail to do so, the motion is granted.[81]

### B. Whether Mr. Miller's Speech Was on a Matter of Public Concern

In order to state a First Amendment retaliation claim, a plaintiff must, *inter alia*, demonstrate that he was retaliated against for speech that involved a "matter

---

[76] ECF Nos. 8 and 9.

[77] ECF No. 8 at 9, 15-16.

[78] Federal Rule of Civil Procedure 12(b)(6).

[79] *Phillips v. Cnty. Of Allegheny*, 616 F.3d 224, 228 (3rd Cir. 2008).

[80] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3rd Cir. 2016).

[81] *Id.*

of public concern."[82]  Here, Defendants argue that Mr. Miller's speech involved only a matter of *private* concern—*i.e.*, his speech was "made to protect the interest of himself, not others"[83]—and was therefore not constitutionally protected.[84]

This Court does not agree with Defendants' reading of Mr. Miller's Complaint.  Although not specified, Mr. Miller alleges, *inter alia*, that he reported "corruption," "mismanagement," "wrongdoing," and "waste" within the City's government.  And as the United States Court of Appeals for the Third Circuit has noted, "[s]peech involving government impropriety occupies the highest run of First Amendment protection."[85]  Defendants' challenge to Mr. Miller's First Amendment claim, then, must fail.[86]

### C. Whether Mr. Miller's Reports of "Corruption," etc., Were Made in Good Faith

The Pennsylvania Whistleblower Law prohibits employers from retaliating against an employee who "makes a good faith report" of "an instance of waste by a

---

[82] *Baldassare v. State of New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001).

[83] ECF No. 6 (Brief in Support of Motion to Dismsis) at 8.

[84] *See Sanguini v. Pittsburgh Board of Public Education*, 968 F.2d 393, 399 (3d Cir. 1992) (noting that there is no First Amendment protection for speech "related solely to mundane employment grievances" or for speech "not made to protect the interests of other employees but only to protect the interests of the complaining employee himself").

[85] *McGreevy v. Stroup*, 413 F.3d 359, 365 (3d Cir. 2005).

[86] In their reply brief, ECF No. 10, Defendants argue, for the first time, that Mr. Miller's factual allegations regarding the alleged "corruption," etc., are insufficiently specific.  Because that argument was not raised in Defendants' opening brief, this Court will not consider it.  *See, e.g., TriState HVAC Equipment, LLP v. Big Belly Solar, Inc.*, 752 F.Supp.2d 517, 529 n.8 (E.D. Pa. 2010).

public body."[87]  Defendants argue that Mr. Miller's reports of "corruption," etc., were not made "without malice or consideration of personal benefit," as is required under that Law.[88]

Mr. Miller has not pled his rationale behind, or motivation for, making his reports, but at this stage of the proceedings, before the development of any factual record, this Court can—and therefore must—infer that the reports were made "without malice or consideration of personal benefit."[89]  Defendants' challenge to Mr. Miller's Pennsylvania Whistleblower Law claim, then, must fail.[90]

### D. Whether Mr. Helm or the FOP Lodge 29 Owed Mr. Miller a Duty of Fair Representation

Labor unions have a duty to fairly represent their members, which duty is breached by conduct that is "arbitrary, discriminatory, or in bad faith."[91]  Defendants argue that that neither Mr. Helm nor the FOP Lodge 29 owed Mr. Miller *any* such duty, and that, therefore, Mr. Miller's claim in this regard should fail as a matter of law.  In support of their argument, Defendants ask the Court to

---

[87] 43 P.S. § 1423.

[88] 43 P.S. § 1422.

[89] *See Abuomar v. Pennsylvania Dept. of Corrections*, 2015 WL 2073783 (M.D. Pa. 2015) ("Nevertheless, this Court agrees with Plaintiff that, on the instant motion, a conclusive determination as to whether Plaintiff made his report of wrongdoing with malice or consideration of personal benefit would be premature.  The exact circumstances and contours of Plaintiff's reports . . . are unknown at this time, as are the Plaintiff's motivations behind so reporting.").

[90] As they did for the First Amendment claim, Defendants raise several new arguments vis-à-vis Mr. Miller's Pennsylvania Whistleblower Law claim in their reply brief.  They will not be addressed here.

[91] *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).

take judicial notice of two Collective Bargaining Agreements between the City of Williamsport and the FOP Lodge 29, which agreements specifically exclude officers "above the rank of Lieutenant"—presumably including Mr. Miller, as Assistant Police Chief—from their coverage.[92]

Even if this Court were to consider these documents not attached to the Complaint, they would be unhelpful to Defendants' argument. Mr. Miller has pled that he was a member of FOP Lodge 29, and all these documents show is that Mr. Miller was not covered by these particular agreements. Defendants' challenge to Mr. Miller's duty of fair representation claim, therefore, must fail.

### E. Whether Ms. Miele Published Any Allegedly Defamatory Comments

In order to prevail on a claim of defamation under Pennsylvania law, a plaintiff must prove, *inter alia*, that defendant has published a defamatory communication to a third party.[93] Defendants argue that Mr. Miller has failed to sufficiently plead that Ms. Miele published—*i.e.*, "communicat[ed] intentionally or . . . negligent[ly] . . . to one other than the person defamed"[94]—any defamatory comments.

As above, this Court does not agree with Defendants' reading of Mr. Miller's complaint. Mr. Miller has alleged that Ms. Miele "indicate[d]" to a

---

[92] ECF No 4, Exs. A and B.

[93] 42 Pa. C.S. § 8343(a).

[94] *Gaetano v. Sharon Herald Co.*, 426 Pa. 179, 182. (1967).

"source" at the Sunbury Daily Item that Mr. Miller "was mentally unstable and not fit to be a Police Chief."[95] Defendants appear to argue that "publication" requires some sort of in-print (or, perhaps, online) memorialization of the allegedly defamatory statement, but such a requirement has been rejected by Pennsylvania courts.[96] Defendants' challenge to Mr. Miller's defamation claim against Ms. Miele, therefore, must fail.

### F. Whether Mr. Miller Has Pled Facts Sufficient to Establish the Alleged Constructive Discharge

To establish a constructive discharge, a plaintiff must show "that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."[97] Defendants argue that Mr. Miller has not pled facts sufficient to allow this Court to infer that he was constructively discharge.

Once again, this Court disagrees with Defendants' reading of Mr. Miller's complaint. The Complaint alleges repeated bad behavior by the Defendants. For example, it alleges that Mr. Hall indirectly threatened to "get rid" of Mr. Miller and later signaled his desire to eliminate Mr. Miller's position. It alleges that Mr. Miller's personal and medical information was posted on Facebook. And it alleges

---

[95] ECF No. 1, Ex. B ¶ 54.

[96] *Gaetano*, 426 Pa. at 182 ("When one speaks of the 'publication' of a newspaper, we think of the actual plant where it is physically printed and 'published.' But his in itself has nothing to do with the 'publication' of a defamatory statement contained in the newspaper.").

[97] *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001).

that Ms. Miele informed a Sunbury Daily Item "source" that Mr. Miller was "mentally unstable." At this stage of the litigation, and on such a fact-intensive issue, Defendants' challenge to Mr. Miller's allegation of constructive discharge must fail.

### G. Whether Mr. Miller Has Pled Facts Sufficient to Support His Demand for Punitive Damages

Under Pennsylvania law, punitive damages are an "extreme remedy available in only the most exceptional circumstances"—*i.e.*, when "defendant has acted in an outrageous fashion due to either [his] evil motive or his reckless indifference to the rights of others."[98] Like they did against Mr. Miller's constructive discharge allegation, Defendants argue that Mr. Miller has failed to plead facts sufficient to support an award of punitive damages. However, like the constructive discharge allegation, this is a fact-intensive issue inappropriate for resolution at the motion to dismiss stage, where no factual record has yet been developed. Defendants' challenge to Mr. Miller's demand for punitive damages, therefore, must fail.

## III. CONCLUSION

For the reasons discussed above, Defendants' motions to dismiss Mr. Miller's Complaint are denied.

---

[98] *Phillips v. Cricket Lighters*, 584 Pa. 179, 188-89 (2005).

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge